1:26mj00068

# AFFIDAVIT

I, Dustin Dobbs, Special Agent for the Food and Drug Administration, Office of Criminal Investigations, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Food and Drug Administration, Office of Criminal Investigations ("FDA/OCI"), assigned to the Washington Metro Field Office, Abingdon, Virginia. I am responsible for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Section 301–399g, the Public Health Service Act ("PHSA"), 42 U.S.C. § 262, and related Title 18 offenses. As a Special Agent with FDA/OCI, I am an investigative law enforcement officer of the United States of America within the meaning of Section 2510(7) of Title 18 United States Code. I have been employed at FDA/OCI since December 2022 and prior to my current assignment, I was employed as a Special Agent by the Federal Bureau of Investigation from September 2017 to December 2022. Based on my training and experience in law enforcement, and conversations with other FDA/OCI Special Agents and other Law Enforcement Officers, I am familiar with the secure and controlled supply chain for prescription drugs in the United States and how their importation could violate federal law.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

3. This affidavit is submitted in support of the arrest of Pavandeep Singh Dhillon (also known as, and referred to hereinafter as, "Pavan Dhillon" or "Mr. Dhillon"), who served as

the responsible corporate officer of Canada Cloud Pharmacy, a company subject to FDA oversight. Based on my training, experience, and the investigation described herein, I have probable cause to believe that Pavan Dhillon, in his capacity as responsible officer of Canada Cloud Pharmacy, did knowingly and willfully conspire to commit and committed the offenses of importing prescription drugs in the United States in violation of 21 U.S.C. § 331 (t) and (aa); introducing misbranded drugs into interstate commerce in violation of 21 U.S.C. § 331(a); and smuggling by knowingly and willfully importing merchandise contrary to law in violation of 18 U.S.C. § 545. He also conspired to defraud FDA and CPB of their regulatory authority as further shown in this affidavit in violation of 18 U.S.C. § 371, and did so with the intent to defraud and mislead.

## JURISDICTION

4. This Court has jurisdiction to issue the requested warrant, because it is “a court of competent jurisdiction” as defined by 18 U.S.C. § 2711. See 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is “a district court of the United States . . . that . . . has jurisdiction over the offense being investigated.” 18 U.S.C. § 2711(3)(A)(i). As described in the paragraphs below, my investigation indicates that numerous suspected illegal transactions occurred throughout the United States, including in the Western District of Virginia (WDVA).

## FDA’s REGULATION OF PRESCRIPTION DRUG IMPORTATION

5. The Food and Drug Administration (“FDA”) of the United States Department of Health and Human Services is the federal agency responsible for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act. 21 U.S.C. § 301, et seq. (“FDCA”). The FDCA, among other things, governs the premarket approval, manufacturing, labeling, and distribution—to include the regulation of the supply chain and

importation—of prescription drugs.[1] The requirements of the FDCA, in part, are meant to ensure that drugs sold for human use are safe and effective and bear labeling that contains accurate and adequate information.

6. A Congressional goal in enacting the premarket approval, labeling, secure supply chain, and importation provisions of the FDCA is to ensure the integrity of America's drug supply. Congress determined that the public interest in the safety and efficacy of prescription drugs distributed to American consumers is so great as to warrant imposition of the highest standard of care on those who distribute these products to the public. Under the FDCA, the responsibility for maintaining the quality and safety of drugs is not placed on the innocent public who purchase drugs, but rather on those who manufacture and distribute them. Congress has determined that consumers have a right to expect that those who distribute and dispense drugs will be vigilant and responsible in matters that affect the public health. Furthermore, consumers expect that prescription drugs they receive are safe, effective, and are, in fact, the products approved by FDA for the United States market.

7. In the United States, with exceptions not applicable here, prescription drugs are distributed in a closed and tightly controlled supply chain from the time they leave the manufacturer to when they are dispensed to or administered to the patient. The Drug Supply Chain Security Act ("DSCSA"), enacted as part of the Drug Quality and Security Act in 2013, amended the FDCA to require, among other things, product tracing, product identifier, verification, and

[1] Prescription drugs are defined as those drugs that either (a) because of their toxicity and other potential for harmful effects, or the method of their use, or the collateral measures necessary to their use, are not safe for use except under the supervision of a licensed practitioner; or (b) are limited to such use by their FDA approval, either in a new drug application (NDA) for a pioneer drug, or an abbreviated new drug application (ANDA) for a generic equivalent of a pioneer drug. *See* 21 U.S.C. § 353(b)(1).

authorized trading partner requirements for manufacturers, repackagers, wholesale distributers, and dispensers to facilitate the tracing of products through the supply chain. 21 U.S.C. § 360eee-1. Trading partners involved in transactions involving prescription drugs also must be either registered with FDA (manufacturers) or licensed with the relevant state and/or federal authorities (wholesalers and dispensers). These supply chain integrity safeguards were enacted to enhance the ability of the FDA to protect consumers from counterfeit, stolen, diverted, and contaminated drugs by establishing a national framework for electronic drug tracing throughout the supply chain.

8. Prescription drugs that are manufactured in the United States and exported to other countries may only be reimported by the manufacturers themselves. 21 U.S.C. § 381(d)(1)(A). Prescription drugs that are manufactured outside the United States may only be imported to the U.S. market if the manufacturer or importer complies with all applicable laws and regulations of the United States to assure the drugs meet FDA's standards for quality, safety, and effectiveness. FDA and HHS have provided two pathways to allow importation of certain prescription drugs that were originally intended for foreign markets.

9. One pathway, enacted by Congress in the 2017 Amendments to the FDCA and further described in a final guidance for industry, describes procedures manufacturers can follow to facilitate the importation of prescription drugs that are FDA-approved, manufactured abroad, authorized for sale in any foreign country, and originally intended for sale in that country (known as "multi-market approved product" or MMA product). 21 U.S.C. § 381(d)(1)(B).[2]

[2] The requirements include, among other things, that the manufacturer has authorized the drug to be marketed in the United States and has caused the drug to bear the FDA-approved labeling. 21 U.S.C. §§ 331(t), 381(d)(1)(B). The importer of the drug must still comply with the Drug Supply Chain Security Act, meaning the drugs would need to be imported by either the manufacturer (defined as the holder of the new drug application or biological license) or an authorized trading partner to ensure that the appropriate product safety and supply chain integrity safeguards are in place. As previously described in paragraph 6, authorized trading partners can only be federally

10. The second pathway to import drugs intended for the foreign market into the United States is known as the Section 804 Importation Program, which allows the limited importation of certain prescription drugs from Canada. *See* 21 U.S.C. § 384. In September 2020, the Secretary of Health and Human Services certified that importation of prescription drugs is allowed under Section 384 if done in accordance with the requirements of the regulations promulgated at 21 C.F.R. Part 251 and that such importation would "pose no additional risk to the public's health and safety" and that it "would result in a significant reduction in the cost of covered products" for American consumers. 21 U.S.C. § 384(l)(1)(A), (B).

11. By regulation, FDA developed procedures to allow the importation of drugs under section 804 [21 U.S.C. § 384], but at this time it only allows importation proposals to be submitted by States and Indian tribes.[3] This pathway specifically excludes biological products, infused drugs, and intravenously injected drugs, likely due to safety concerns with these complex products. 21 U.S.C. § 384(a)(3)(B), (C), (D). It also requires that any establishment within Canada engaged in the distribution of a prescription drug that is imported or offered for importation into the United States be registered with FDA and name a United States agent for the establishment. 21 U.S.C. § 384(f).

---

or state licensed wholesalers, state licensed pharmacies, or medical practitioners licensed by law to dispense or administer prescription drugs. 21 U.S.C. § 360eee(2)(A), (B), (D).

[3] To date, the Commonwealth of Virginia has not participated in the Importation Program under 21 U.S.C. § 384. In January 2024, FDA approved Florida's Section 804 Importation Program (SIP) making it the first state in the nation to receive federal authorization to import certain prescription drugs under certain conditions. At the time of this document, there are approximately 7 states that have enacted legislation to establish a drug importation program under 21 U.S.C. § 384. Virginia has passed legislation that has established a workgroup to examine the impact of a state importation program but has not established an importation program under 21 U.S.C. § 384. Regardless, defendant would not be eligible to import or facilitate importation under this program even if Virginia had an approved SIP since FDA is currently only authorizing states and not individuals to import prescription drugs under this program.

12. Section 804 [21 U.S.C. § 384], the statute discussed above that allows the importation of wholesale quantities of certain prescription drugs from Canada under limited conditions, also provides for a waiver procedure to allow individuals to import prescription drugs for personal use. 21 U.S.C. § 384(j). The Secretary of HHS has not yet provided the required certification to Congress that this pathway for importation by individuals for their personal use will not pose any "additional risk to the public's health and safety" and result in a "significant reduction in the cost of covered products to the American consumer." See 21 U.S.C. § 384(l). Consequently, this pathway is not a viable pathway to import prescription drugs and FDA cannot even consider waivers at this time. FDA has, however, published guidance on personal importation, that predates the above-referenced importation legislation. In that guidance, FDA states that in most circumstances it is illegal for individuals to import drugs into the United States for personal use but that FDA personnel may be more permissive in allowing the personal importation provided that the product is not for further sale or distribution in U.S. commerce and that other conditions are met. This guidance has been in place since at least August of 1997, when it was published in the Regulatory Procedures Manual.[4] These conditions to allow importation from foreign countries include if the imported drug: (1) is for a serious condition for which effective treatment may not be available domestically through commercial or clinical means; (2) is not further commercialized or promoted to persons in the U.S.; (3) does not present an unreasonable risk; and (4) is in a quantity that is less than a 3 month supply and the recipient provides documentation of medical supervision.[5] FDA's guidance on personal importation is not

---

[4] *See generally* https://ntrl.ntis.gov/NTRL/dashboard/searchResults/titleDetail/PB97196182.xhtml;jsessionid=d0609a107e48787b01eda35ea97f under General Guidance on page 409.

[5] *See generally* https://www.fda.gov/industry/import-basics/personal-importation#whatis.

intended as a way for consumers to bring lower-priced prescription drugs into the United States; rather, FDA intended this enforcement discretion to allow individuals to access treatments not otherwise available in the United States.

13. Pharmaceuticals manufactured for foreign markets are almost always considered unapproved and misbranded drugs under U.S. law, whether counterfeit or even if made by the same manufacturer that produced the version sold in the United States. Such drugs may have different approved labeling (including different warnings, dosage recommendations, and indications for use) and may be manufactured in a place different than as listed in the New Drug Application approved by FDA. While the U.S. wholesale distribution market is highly regulated, many other markets around the world are not. Pharmaceutical distributors and brokers who circumvent U.S. law and illegally import foreign pharmaceuticals into the United States put their customers/patients at risk for receiving counterfeit, misbranded, and/or adulterated drugs.

**ADDITIONAL DRUG LAW AND PROHIBITED ACTS**

14. The FDCA requires the labels and labeling[6] of all drugs to display certain information. All drugs are required to have labeling that bears adequate directions for use.[7] 21 U.S.C. § 352(f). Because a prescription drug, by definition, is safe for use only under the supervision of a licensed medical practitioner (not a layperson), all prescription drugs must qualify for an exemption to this labeling requirement before they may be introduced into interstate

[6] The FDCA defines the term "label" to mean "a display of written, printed, or graphic matter upon the immediate container of any article. . ." 21 U.S.C. § 321(k). The FDCA defines "labeling" to mean "all labels and other written, printed or graphic matter (1) upon any article or any of its container or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

[7] "Adequate directions for use" are defined by regulation as directions under which the layman can use a drug safely and for the purposes for which it is intended. 21 C.F.R. § 201.5.

commerce. See 21 U.S.C. § 353(b)(2); 21 C.F.R. § 201.100. The exemption to this requirement for prescription drugs is set forth in 21 C.F.R. § 201.100, which imposes a number of conditions,[8] all of which must be met. Several of the conditions relevant here are that: (1) a drug subject to the new drug statute must bear the FDA-approved labeling; and (2) a drug must be lawfully dispensed pursuant to a valid prescription, the parameters of which are determined by state law. To dispense drugs into Virginia, a non-resident pharmacy must be registered with the Virginia Board of Pharmacy and designate a pharmacist-in-charge who is licensed in Virginia. Code of Virginia § 54.1-3434.1. 21 U.S.C. § 201.100 (a), (c). The label also must bear the notation "Rx only." 21 C.F.R. § 201.100 (b)(1); see also 21 U.S.C. § 353(b)(4)(A).

15. Drugs that are required to comply with the new drug approval statute but that do not comply with that statute are "unapproved new drugs" and it is a violation of the FDCA for them to be distributed in interstate commerce. 21 U.S.C. § 331(d).

**<u>Misbranding Provisions</u>**

16. Among other reasons, a drug is considered "misbranded" under the FDCA if any one of the following is true:

a. The drug's labeling lacks adequate directions for use, meaning directions under which a layman can use the drug safely and for the purposes for which it was intended, and

---

[8] This includes that the drug is in the possession: (i) of a person regularly and lawfully engaged in the manufacture, transportation, storage, or wholesale distribution of prescription drugs; or (ii) of a retail, hospital, or clinical pharmacy regularly and lawfully engaged in dispensing prescription drugs; or (iii) of a practitioner licensed by law to administer or prescribe such drugs; and the drug is to be dispensed in accordance with 21 U.S.C. § 353(b), *i.e.* by a valid written or oral prescription by a licensed medical practitioner. 21 C.F.R. § 201.100(a)(1), (2). This exemption also requires that if the drug is subject to section 505 of the Act [21 U.S.C. § 355, or the new drug[8] statute] that it bear the labeling authorized by the approved new drug application.

fails to qualify for an exemption to the labeling requirement. See 21 U.S.C. § 352(f)(1) and 21 C.F.R. §§ 201.5, 201.100;

b. It is manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered with FDA as required under 21 U.S.C. § 352(o); or

c. Its label fails to bear the "Rx Only" symbol required by 21 U.S.C. § 353(b)(4).

**PROHIBITED ACTS**

**Federal Food, Drug, and Cosmetic Act Violations**

17. Under the FDCA, commission or causing the commission of the following constitute a "prohibited act" under the statute:

a. The introduction or delivery for introduction into interstate commerce of a misbranded drug. 21 U.S.C. § 331(a).

b. The introduction into interstate commerce of a new drug in violation of section 505 [21 U.S.C. § 355, i.e. the new drug statute]. 21 U.S.C. § 331(d).

c. The importation of a drug in violation of section 801(d)(1) of the FDCA [21 U.S.C. § 381(d)(1)] or the failure to comply with section 582 of the FDCA [21 U.S.C. § 360eee-1, i.e. DSCSA]. 21 U.S.C. § 331(t).

d. The importation of a drug in violation of section 804 [21 U.S.C. § 384]. 21 U.S.C. § 331(aa).

18. Commission of a prohibited act is a strict liability misdemeanor under the FDCA, punishable by a fine and up to a year in prison for each violation, regardless of the mens rea of the defendant. See 21 U.S.C. § 333(a)(1). If the violation is done with the "intent to defraud or mislead" consumers or a government regulatory agency, commission of a prohibited act constitutes a felony under the FDCA, punishable by a fine and up to three years in prison for each violation.

21 U.S.C. § 333(a)(2). Knowing violations of certain of the importation statutes are felonies punishable up to 10 years in prison. 21 U.S.C. § 333(b)(1)(A).

**<u>Conspiracy</u>**

19. Title 18 U.S.C. § 371 prohibits conspiring to commit an offense against the United States, or to defraud the United States or an agency thereof and doing an act to effect the object of the conspiracy. A violation of 18 U.S.C. § 371 is punishable by a fine and 5 years in prison if the offense that is the object of the conspiracy is a felony; if the object offense is a misdemeanor, then the penalty is equivalent to the maximum penalty for the object offense.

**<u>Smuggling</u>**

20. Title 18 U.S.C. § 545 in summary prohibits knowingly and willfully importing merchandise contrary to law or defrauding the United States government by avoiding customs duties. A violation of 18 U.S.C. § 545 is punishable by fine and/or imprisonment of not more than 20 years.

**I. International Prescription Program**

21. An "International Prescription Program" ("IPP") is generally, and as relevant here, defined as a program that enables individuals to obtain prescription medications across international borders, often to reduce costs. The IPP programs discussed in this document are inconsistent with the FDCA and are illegal, as they source drugs that are not meant for the U.S. market and not FDA approved. There are several public health risks related to IPP, including but not limited to:

a. Safety and quality;

b. Counterfeit medications;

c. Improper dosing/labeling, sometimes in a foreign language;

d. No adverse reporting pathway;

e. Lack of quality control; and

f. Lack of the same regulatory approval or rigor as the US FDA.

22. "International Pharmacy Benefit Managers" ("IPBMs"), also known as specialized plan brokers, as discussed here, are companies that administer prescription drug benefits on behalf of employers. IPBMs are responsible for coordination between the employer, the employee, and the international pharmacy. Part of their duties include but are not limited to:

a. Market IPPs to employers or have IPPs marketed to employers by other companies, such as "Third Party Administrators" ("TPAs");

b. Review employee prescription records to identify employees with recurring prescription drugs that could be sourced internationally;

c. Contact employees (or "plan members") to market IPPs;

d. Coordinate between employees and international pharmacies by collecting prescriptions from employees and sending them to international pharmacies; and

e. Coordinate payment between the employer and the international pharmacy.

23. In short, IPBMs administer the prescription benefit and coordinate between the international pharmacies and the employees.

24. International pharmacies are utilized to fulfill the prescriptions that are provided to them through IPBMs. The foreign pharmacy dispenses the medication and ships it directly to the United States plan member's address.

**II. Target Entity: Canada Cloud Pharmacy**

25. According to their website, canadacloudpharmacy.com, Canada Cloud Pharmacy (hereinafter "Cloud Pharmacy") is a Canadian pharmacy licensed in British Columbia and located at 4918 Victoria Drive, Vancouver, British Columbia.

26. Cloud Pharmacy's LinkedIn page states, "Cloud Pharmacy is one of Canada's largest online pharmacies, providing patients with convenient, secure, and accessible prescription services nationwide. We leverage advanced technology and data solutions to streamline medication delivery, enhance patient care, and ensure a seamless healthcare experience" and was founded in 2012.

27. As further described below, Cloud Pharmacy utilized orders@canadacloudpharmacy.com to communicate with Person 2 and employees of ScriptSourcing, LLC, (both described in more detail below) concerning the illegal importation of drugs into the WDVA.

28. In one email sent by orders@canadacloudpharmacy.com related to the illegal importation of drugs into the WDVA and described in more detail below, the email address orders+receipt@canadacloudpharmacy.com was copied on the email.

### III. Relevant Cloud Pharmacy Employees

29. Pavan Dhillon is the Founder and President of Cloud Pharmacy in Vancouver British Columbia, Canada, according to his LinkedIn page accessed on July 1, 2026. Mr. Dhillon's LinkedIn page claims that Cloud Pharmacy is one of Canada's largest online pharmacies that provides prescription services nationwide. Based upon the investigation, Mr. Dhillon is known to operate telephone number 236-558-1590.

30. Keagan McLean ("Mr. McLean") is Mr. Dhillon's brother-in-law and works at Cloud Pharmacy at the operational and executive level. Based upon the investigation, Mr. McLean is known to use the email keegan@cloudpharmacy.com and telephone number 250-893-8634.

**IV. ScriptSourcing, LLC**

31. ScriptSourcing, LLC ("ScriptSourcing") is a private company located in Bonita Springs, Florida, that offered an "International Prescription Program" ("IPP") marketed to self-funded employer health plans. The company claimed to offer dramatic savings through international sourcing of brand-named drugs.

32. Gary Becker is the founder and CEO of ScriptSourcing. He is described on ScriptSourcing's website, located at https://scriptsourcing.com/founder-story/, as "a health insurance and risk management consultant for more than 30 years."

33. ScriptSourcing claimed it could save customers money by offering a zero-dollar copay for prescription drugs from direct sourcing and sourcing from international pharmacies that are from "tier one" countries.

34. ScriptSourcing's marketing materials and website consistently emphasize international procurement of brand-name drugs, delivered directly to patients at home, with advertising benefits such as "$0 copay" and "free shipping."

35. One testimonial posted on scriptsourcing.com states: "Through ScriptSourcing's international program, Restasis costs me absolutely nothing and will save our company over $1,000 on an annual basis. What's more, the entire process was so easy. I called the staff at ScriptSourcing who directed me to the source where I can obtain my prescription. I now receive my three-month prescription from Canada shipped directly to my office, as it's more convenient for me."

36. Gary Becker discusses in a video, located at https://www.youtube.com/watch?v=N-LqFHSg78E, that ScriptSourcing's international pharmacy program sources drugs from Canada, United Kingdom, New Zealand, and Australia. Gary Becker described these countries as "tier one countries" with the same oversight and requirements as the FDA in the United States. This information is also found in other marketing material for ScriptSourcing.

37. Mr. Becker stated in a video, located on ScriptSourcing's website, that ScriptSourcing was able to provide solutions to employers in every single state. This, as described in this document, includes the WDVA.

**V. Virginia Department of Health Professions (DHP) Complaint**

38. On May 16, 2025, I received a complaint that originated from the Virginia Department of Health Professions (DHP). This complaint was also submitted to the FDA via MedWatch, MedWatch identification number 747109. The complaint described a patient (referred to herein as "Person 1") that had been hospitalized due to an alleged misbranded drug that had been shipped in interstate commerce from Canada into the WDVA. The complaint form stated the following:

a. "Patient had been receiving Mounjaro from local dispensing pharmacy up until 12/2025 [sic]. Patient's insurance enrolled patient with Script Sourcing to get medication at a lower cost. Patient received a supply of Mounjaro vials in the mail from Cloud Pharmacy, located outside of the United States, starting January 2025. After starting the new supply of Mounjaro weekly, patient experienced increased side effects after each weekly dose In [sic] January and February even though patient had been maintained on the same drug and dose for months prior. In February 2025, patient was hospitalized with a small bowel obstruction.

Of note, the prescription label instructions say: 'Draw and inject the entire contents of 1 vial (=12.5mg) subcutaneously once weekly'

The vial is 12.5 mg/0.5 mL vial, but it contains more than 0.5 mL. Patient was likely getting a higher dose/exposure to drug which correlates with increased side effects after starting the new supply."

39. The complaint also included photos of the Mounjaro that Person 1 had received. The package in the photo showed that the medicine was sent from Cloud Pharmacy, 4918 Victoria Drive, Vancouver, BC (British Columbia), V5P 3T6. The package stated, "Not for distribution outside of Canada." The package also had the "Pr" symbol instead of the "Rx only" symbol that is required for prescription drugs in the United States, thus rendering these drugs misbranded on that basis alone. The "Pr" symbol is a Canadian symbol that denotes prescription drugs. They also are misbranded for not qualifying for the exemption that their labeling bear adequate directions for use since they are not lawfully wholesaled or dispensed. Cloud Pharmacy is not licensed in the Commonwealth of Virginia and therefore could not be an authorized trading partner of a manufacturer or wholesaler lawfully distributing drugs in the secure prescription drug supply chain in the United States. Any distribution into the United States from this pharmacy would violate the DSCSA, 21 U.S.C. § 331(t), 360eee-1(d)(3). Cloud Pharmacy is also not registered with FDA under 21 U.S.C. § 384(f) and thus any distribution in the United States would also violate 21 U.S.C. § 331(aa).

40. On May 23, 2025, after reviewing photos of the package in the complaint, a representative from Eli Lilly and Company stated in an email correspondence: "Based on an examination of the submitted photographs, the carton appears to be consistent with authentic Mounjaro 12.5mg/0.5mL packaging materials; however, a definitive conclusion of authenticity

would require an evaluation of the actual sample. The batch, expiry date and serialization data are valid, and this sample was designated for the market in Canada, not the United States."

41. ScriptSourcing was discussed in the complaint as being the company that sourced the foreign medication for Person 1 starting in January of 2025.

42. As noted in previous paragraphs, there are limited ways that prescription drugs may legally be imported into the United States. Manufacturers of the drugs are allowed to import their drugs into the United States if they follow certain procedures and label them for the U.S. Market. With exceptions not applicable here, foreign pharmacies are not permitted to import prescription drugs into the United States. These drugs would also not qualify for enforcement discretion that allows for the limited importation of a personal supply of drugs because, among other things, Mounjaro is commercially available in the United States. *See* ¶ 12 (summarizing FDA's guidance regarding the personal importation of prescription drugs).

43. The procedure established by Congress under Section 804 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. § 384] that allows U.S. pharmacists and wholesalers to import drugs from Canada also does not apply here because FDA at this time only allows importation proposals to be submitted by states and Indian tribes and the Commonwealth of Virginia currently has only established a workgroup to examine the impact of a state importation program but has not established an importation program under Section 804. *See* ¶ 11. Regardless, such a program would require the importation to be done by a licensed U.S. wholesaler or pharmacy and not by a foreign pharmacy sending directly to a patient.

44. The imported Mounjaro would also not be allowed to be imported under the waiver program for individuals established in section 804(j) [21 U.S.C. § 384(j)] and granted on a case-

by-case basis because no one applied for a waiver and no waivers have yet to be granted under this statute.

**VI. Interview of Person 1**

45. On September 4, 2025, I interviewed Person 1 at her place of work in Saltville, Virginia. Person 1 resided in Chilhowie, Virginia, and worked for a healthcare provider located in Saltville, Virginia, hereinafter referred to as Company 1. Person 1 stated that her medical care was provided to her by Company 1 and they utilized https://90degreebenefits.com ("90 Degree") as their health care benefits manager. Person 1 said a representative from 90 Degree presented ScriptSourcing as an option to the employees of Company 1 during their 2024 Christmas Party.

46. On September 4, 2025, Person 1 provided me with emails between Person 1 and ScriptSourcing Member Advocate LaDeen "Neena" McCray-Davis ("Ms. Davis"). During these email communications, Ms. Davis discussed enrolling Person 1 in ScriptSourcing's program. Below is a redacted excerpt from these communications from Ms. Davis:

**From:** LaDeen (Neena) McCray-Davis <neena.davis@scriptsourcing.com>
**Sent:** Tuesday, November 12, 2024 11:46 AM
**To:** [redacted]
**Subject:** Enrollment Complete- (Rx #2 of 2 received) [redacted] - $0 Copay Program - ScriptSourcing

Hi [redacted]

I hope that you are well! I wanted to let you know that I have received your **both of your** prescriptions and have submitted everything to the pharmacy to process. ***The pharmacy team will contact you from Canada Cloud Pharmacy to confirm. Please look for a call from 1-800-901-0041 to appear on your caller ID.***

If you have any questions or need tracking information, please let me know.

Thank you!

Neena

*Kindly leave a positive google review if you are happy with our services!*

LaDeen "Neena" McCray-Davis

Member Advocate

Email: Neena.Davis@ScriptSourcing.com

Phone: 410.753.3508

Click to schedule a call with Neena

3301 Bonita Beach Rd Suite 106

47. As described in the above email, Person 1 said she received a phone call from Cloud Pharmacy providing instructions about Person 1's medications. Cloud Pharmacy informed

Person 1 that Person 1 would receive a large orange package containing the medications. Cloud Pharmacy instructed Person 1 to return the package and the cold packs to Cloud Pharmacy once the medications were received.

48. When Person 1 received the medications from Cloud Pharmacy at Person 1's home in Chilhowie, Virginia, Person 1 noted that the box was approximately three feet by two feet and contained cold packs and approximately 90 days of Mounjaro (12 vials) and needles for self-injection. Person 1 stated that the "cold packs were really not that cold." Cloud Pharmacy told Person 1 to discard the Mounjaro after a certain number of days if it appeared that the cold chain was broken. Cloud Pharmacy informed Person 1 that Mounjaro could be at room temperature for a certain number of days.

49. Person 1 began taking the Mounjaro from Cloud Pharmacy that was sourced by ScriptSourcing as directed. Since Person 1 was not accustomed to drawing medication from a vial into a needle, Person 1 followed the directions completely. The directions instructed Person 1 to draw the entire vial into the syringe for injection.

50. Person 1 began getting sick after each shot of Mounjaro she received from Cloud Pharmacy. Person 1 said Person 1 had to take approximately one day per week of sick leave during the time Person 1 took the Mounjaro she received from Cloud Pharmacy.

51. Person 1's negative reactions to the medication culminated with a sudden onset of pain that was believed to be a kidney stone or gallbladder issue. Person 1 went to the hospital and was told that she had a bowel obstruction.

52. After Person 1 was hospitalized, a pharmacist at Company 1 inspected the Mounjaro that Person 1 was receiving from Cloud Pharmacy and noted that the amount of medication in the vials was approximately double what Person 1 was prescribed.

53. Person 1 believed the negative reactions to the Mounjaro were due to receiving a significantly larger dose than prescribed. Person 1 also believed it could have been because the medication was not temperature controlled appropriately. Person 1 also received Dexilant and Crestor from Cloud Pharmacy but did not have any issues with those medications.

54. Person 1 identified risks observed with sourcing drugs from foreign countries. First, the products were different and the instructions led to her receiving almost twice the dosage of medication prescribed by her physician. Additionally, Person 1 was aware that the Mounjaro delivery systems provided to Company 1 employees that she worked with varied and included vials, pens, and dial-up pens.

## VII. Interview of Person 2

55. On September 4, 2025, I interviewed Person 2. Person 2 was another employee of Company 1 who resides in the WDVA and also received Mounjaro from Cloud Pharmacy, sourced by ScriptSourcing. Person 2 was aware of several patients who worked at and received healthcare at Company 1 that received their recurring medications from ScriptSourcing and Cloud Pharmacy.

56. I have also had email communications with Person 2 to coordinate interviews and obtain additional information. On November 4, 2025, Person 2 provided me with several emails that she had received that related to prescription drugs that she was getting through ScriptSourcing from Cloud Pharmacy.

57. On August 26, 2024, Person 2 received an email from ScriptSourcing employee Angelique Tapia. Ms. Tapia introduced herself as a Member Advocate for ScriptSourcing. Ms. Tapia's signature block described Ms. Tapia as the Member Advocate Team Lead for ScriptSourcing. In this email, Ms. Tapia provided a document labeled as the "2024 Med-Finder

Flyer" that showed how to enroll in ScriptSourcing and how to search for medications that were offered by ScriptSourcing. The flyer also described how enrolled members will receive their medication(s) at no cost with no copays.

58. Also, attached to this email was a video that described how ScriptSourcing worked. A summary of what was said in this video is below:

a. ScriptSourcing provides an exciting new prescription program that would save customers a lot of money by providing them with no cost brand name medications. ScriptSourcing makes available over 800 brand name and maintenance medications for a zero-dollar copay. Most name brand medicines are two to ten times more expensive when purchased in the United States versus other countries. ScriptSourcing works with pharmacies located in four "Tier One" countries, Canada, United Kingdom, Australia, and New Zealand. These English-speaking countries are deemed by Congress to have the same or higher standards as the United States.

b. "We [ScriptSourcing] can guarantee the pedigree, safety, and security of every single med that is shipped, safety is number one." ScriptSourcing will only ship **FDA approved** maintenance and name brand medications. These medications will require a United States doctor prescription, and they will not ship narcotics or lifestyle medications.

c. The video also described how a member advocate works with the members to get everything setup and the prescription drugs can be shipped directly to the member's home.

59. On November 6, 2024, Person 2 received an email from Ms. Tapia. In this email Ms. Tapia stated the following:

a. "I have received your prescription and have submitted everything to our enrollment team to process. We will ship to the work address provided. Attached is a copy of your enrollment form that I have submitted to the pharmacy and a copy of the shipping agreement we discussed earlier on the phone. The pharmacy will contact you to confirm your order and will email you tracking information so that you know exactly when to expect the medication. Please make sure you have at least a 30-day supply of your medication on hand to make sure you won't run out of medication while we are getting you set up in our system.

   Additionally, please ensure to notify your current pharmacy or pharmacy program to cease automated refills of this medication/these medications if applicable, as refills will be processed automatically via the ScriptSourcing program following enrollment.

   If you have any questions at all, please let me know. Thank you!"

b. Attached to this email was a document labeled as "Access Form – [Person 2]". The header of the form was: "Canada Cloud Pharmacy Order Form."

c. Another attachment to this email was a document labeled "[Person 2] – Aerosafe Shipping Agreement 11.06.24" that described the shipment process and had "ScriptSourcing" in the header of the document. The document also detailed that if the patient had any questions, they should

reach out to their ScriptSourcing representative. Ms. Tapia signed this document on behalf of Person 2.

60. In an email from Ms. Tapia to Person 2 on November 13, 2024, Ms. Tapia wrote "We received a Rx from your doctor for 90 days of 12.5mg. I have asked the pharmacy to ship the 10mg as well, per comment on the Rx the 12.5mg starts after 1 more month of 10mg."

61. Based on the attachments to the November 6, 2024, email to Person 2 and the context of these emails and later emails received by Person 2 from Cloud Pharmacy described below, the "pharmacy" Ms. Tapia referenced in the November 6 and November 13, 2024, emails to Person 2 was Cloud Pharmacy. These emails and their attachments demonstrate the level of involvement ScriptSourcing and Cloud Pharmacy had in this conspiracy.

62. In an email from orders@canadacloudpharmacy.com to Person 2 on November 14, 2024, Cloud Pharmacy sent tracking information to Person 2 for an order from Cloud Pharmacy, order number A171119. A review of that tracking information showed that Cloud Pharmacy utilized Priority Mail Express International, a feature offered by the United States Postal Service ("USPS"), to send a package from Canada to be processed in California and be delivered to Person 2 in Marion, Virginia.

a. On November 5, 2025, I confirmed with Person 2 that this email was related to an order for prescription drugs that were ordered through ScriptSourcing and shipped to Person 2 from Cloud Pharmacy.

63. In an email from orders@canadacloudpharmacy.com to Person 2 on January 14, 2025, Cloud Pharmacy provided "(I)nstructions for receiving your package." Copied on the email

were the email addresses reeny.tsapos@scriptsourcing.com,[9] morgan@scriptsourcing.com,[10] and orders+receipt@canadacloudpharmacy.com. This email listed Person 2's home address in Marion, Virginia, as the address to which the package was being shipped. The email described how Person 2 needed to take extra care in receiving her medication due to the temperature-sensitive nature of the medication. This email also stated that "Canada Post will pick up the package and email you a universal tracking number, before forwarding it to USPS." This statement and other statements in this email indicate that Cloud Pharmacy utilized the Canada Post in conjunction with the USPS to ship the package from Cloud Pharmacy in Canada to Person 2 in Marion, Virginia. This email also demonstrates the coordinated conspiracy between Cloud Pharmacy and ScriptSourcing.

a. On November 5, 2025, I confirmed with Person 2 that this email was related to an order for prescription drugs that were ordered through ScriptSourcing and shipped to Person 2 from Cloud Pharmacy.

64. On February 18, 2025, Person 2 received an email from morgan@scriptsourcing.com with the subject "Order#368380." Below is a screenshot of that email:

[9] Reeny Tsapos lists on her LinkedIn page that she works in Pharmacy Operations for ScriptSourcing and has done so since July 2021.

[10] Morgan Myers lists on her LinkedIn Profile that she is the Lead Pharmacy Operations Coordinator at ScriptSourcing.

---------- Forwarded message ---------
From: <morgan@scriptsourcing.com>
Date: Tue, Feb 18, 2025 at 2:32 PM
Subject: Order# 368380
To: [redacted]

Hi [redacted],

Thank you for choosing Script Sourcing. We have started to process your order. You will receive a tracking email once your order has shipped.

Please review your shipping address below.

If you need to update your shipping address or if you have any additional questions, email your inquiry to save@scriptsourcing.com

**Shipping Address** **Order #:** 368380
[redacted]
Saltville, Virginia 24370
United States
p: [redacted]

| | Item | Quantity |
|---|---|---|
| [redacted] | Mounjaro (15mg/0.5mL) (1 vial qty) | 4 (4 vial total) |

Copyright © 2002 - 2025 Script Sourcing | Powered by PharmacyWire

### VIII. Injury and Safety Risks

65. ScriptSourcing's international drug importation program, in conjunction with Cloud Pharmacy, has caused injury to an individual. The hospitalization of Person 1 in Saltville, Virginia, due to complications with her medication sourced by ScriptSourcing utilized Cloud Pharmacy to import the illegal drugs.

66. Additionally, public health literature warns that international pharmacy programs sourcing drugs for U.S. patients pose significant risks of personal injury. Because these programs

operate outside of stringent FDA oversight, patients risk receiving counterfeit, substandard, or mislabeled medications that contain dangerous ingredients or incorrect dosages, which can lead to ineffective treatment, serious adverse effects, overdose, and even death. In addition to the direct risks from the medication itself, a lack of appropriate medical supervision and clear, standard labeling can lead to medication errors and further jeopardize patient safety.[11] [12]

67. In an interview with Person 1, she informed me that she was able to get her medication from Cloud Pharmacy through ScriptSourcing and also get her medication from a local pharmacy. Person 1 noted she would not be able to obtain a double fill of her prescription if both pharmacies were located in the United States. Person 1 observed that this ability to double fill prescriptions could lead to medication overdosing or diversion.

## IX. Email Search Warrant **orders@cloudpharmacy.com and** orders+recept@canadacloudpharmacy.com

68. On December 5, 2025, a search warrant was issued in the WDVA by the Honorable Pamela Meade Sargent for orders@cloudpharmacy.com and orders+receipt@canadacloudpharmacy.com for the time period of November 14, 2024 to the date of service, December 7, 2025. A review of documents produced in response to this search warrant revealed many documents that outlined Cloud Pharmacy's knowledge of the illegal activity, their methods to attempt to circumvent the legal framework that protects Americans from illegally

[11] AMA Council on Science and Public Health. (2024, April). *What should prescribers and policy makers know about US drug importation?*. Journal of Ethics, *26*(4). https://journalofethics.ama-assn.org/article/what-should-prescribers-and-policy-makers-know-about-us-drug-importation/2024-0

[12] Mackey, T. K., & Liang, B. A. (2011). Digital danger: A review of the global public health, patient safety, and cybersecurity risks of the illicit online drug trade. *BMC Medicine*, *9*(1), 117. https://bmcmedicine.biomedcentral.com/articles/10.1186/1741-7015-9-117

imported drugs, and the level of involvement Cloud Pharmacy had in this conspiracy with ScriptSourcing.

69. On December 4, 2024, a presumed client of Cloud Pharmacy sent an email to orders@cloudpharmacy.com, and others from Cloud Pharmacy that was labeled "Notice of FDA ACTION". This document outlined the illegal activity that was performed by Cloud Pharmacy when they imported misbranded drugs into the United States. The substance of this document is below:

Thank you for your email and phone call regarding your mail package. In response to your inquiry, the Federal Food, Drug, and Cosmetic Act prohibits persons from importing into the U.S. any prescription drug that has not been approved for sale by the United States Food and Drug Administration (FDA), or which is adulterated or misbranded within the meaning of the Act. Furthermore, the product is subject to the FDASIA (Food and Drug Administration Safety and Innovation Act) Section 708 Destruction Authority. FDA's mission is to ensure that drugs are safe and effective. The agency works to do this by approving safe, effective, and high-quality prescription and generic drugs. Any version of a drug that has not been approved by the FDA is considered an "unapproved drug," and it is illegal for consumers to import unapproved drugs into the U.S. Drugs from foreign sources that are not FDA-approved do not have the same assurance of safety, effectiveness, and quality as drugs subject to FDA oversight. In many cases, such drugs have been found to be contaminated, counterfeit, contain varying amounts of active ingredients or none at all, or contain different ingredients altogether. This drug has not been listed as an approved drug for distribution in the U.S. Per the regulation under the FDASIA 708 Destruction Authority, this drug will be destroyed once the timeframe is reached; however, please see conditions of personal importation.

Please see the conditions of **FDA's Personal Importation (PI)** at https://www.fda.gov/industry/import-basics/personal-importation, which are also listed below. Generally, **all of the conditions of the PI must be met for release to be considered. Please be aware that cost is not a factor considered for PI** (see https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/frequently-asked-questions-about-drugs). If you feel that you qualify for PI, please send me an email addressing the following conditions below.

**PI conditions (for US Citizens and permanent residents):**

Product is for the treatment of a serious condition (Prescription Drug Products):

- The product is for a serious condition for which effective treatment may not be available domestically either through commercial or clinical means.
- There is no known commercialization or promotion of the product to persons residing in the U.S.
- The product does not represent an unreasonable risk.
- The consumer affirms in writing that the product is for personal use.

• The quantity is generally not more than a three-month supply and either:

a) Provide the name and address of the doctor licensed in the U.S. responsible for your treatment with the product, or

b) Provide evidence that the product is for the continuation of a treatment begun in a foreign country.

You may wish to speak to your medical practitioner regarding obtaining this prescription from an approved source. Information on the FDA's Administrative Destruction Authority may be found at this link: http://www.fda.gov/ForIndustry/ImportProgram/Resources/ucm494173.htm

Millions of parcels come into this country on a daily basis and this was a routine sample check. The one goal for the FDA is to keep the public health safe and I stand by that goal. Many countries often have their own laws and regulations and a drug approved for use in another country but not approved by the FDA would be considered an unapproved drug in the U.S. The big issue is that this drug is a foreign-made drug and is produced specifically for ***foreign markets and their own citizens***. Every country has their own laws and regulations, and this drug is ***not*** complying with U.S. Law.

**A listing of available U.S. FDA approved drugs** can be found at the following link and searching by active ingredient: Approved Drug Products with Therapeutic Equivalence Evaluations | Orange Book | FDA.

I understand that you may need to obtain a refund from the dispensary. You may show them the FDA Notice of Action as proof for the detained mail package. In most circumstances, it is illegal for individuals to import drugs or devices into the U.S. for personal use because these products purchased from other countries often have not been approved by the FDA for use and sale in the U.S. For example, a drug approved for use in another country but not approved by the FDA would be considered an unapproved drug in the U.S. and, therefore, illegal to import.

[redacted]

Compliance Officer

Office of Inspections & Investigations (OII)

Office of Import Operations (OIO)

Division of West Coast Imports (DWCI)

U.S. Food and Drug Administration (FDA)

70. As shown, Cloud Pharmacy was made aware of the illegal nature of their business venture that included illegally importing drugs into the United States.

71. Another example of this letter was to a client of ScriptSourcing and Cloud Pharmacy in Quakertown, Pennsylvania on or about December 16, 2024. The client forwarded the letter to Cloud Pharmacy who in turn forwarded it to ScriptSourcing. This letter highlighted that personal importation requires that “There is no known commercialization or promotion of the product to persons residing in the US.”

72. One member sent Cloud Pharmacy an email on May 27, 2025, stating, "I have an email from UPS saying they are asking for a foreign passport and a prescription. And it is in FDA customs holding. I am not sure what to do. In response to this email Cloud Pharmacy replied with the following:

> There's no action needed on your part at this time. I've arranged for a reshipment to be sent out today to avoid any delays. We'll also be following up with UPS to resolve the issue. Please let us know if UPS continues to email you.

73. The member responded by stating that they had received a phone call from UPS. "they are trying to tell me it's illegal to ship prescriptions from Canada to the US unless I have a foreign passport or I was in Canada recently…" Cloud Pharmacy replied with the following email:

**From:** Amreen Grewal <orders@canadacloudpharmacy.com>
**To:** [redacted]@gmail.com
**Subject:** Re: Re: Tracking Number for Cloud Pharmacy Order T200439
**Date:** Thu, 29 May 2025 21:09:01 +0000

---

Hi [redacted]

I'm so sorry for the inconvenience and thank you for bringing this to our attention again! This is our first time using UPS for shipments like these, and we're still working through a few kinks in the process.

Please rest assured—your reshipment is already on its way, so there's no need to worry about the original UPS package. You can safely ignore any calls or notifications you receive from them. We are in direct contact with UPS and will handle any issues on our end.

Just to clarify, it is not illegal to ship prescriptions from Canada to the U.S. when done in compliance with regulatory guidelines. UPS's comment may have been a misunderstanding of the process, and we are actively addressing it.

Thanks again for your patience and understanding!

Best,

Amreen

Toll free: 1-800-901-0041
Fax: 1-888-258-7962
www.canadacloudpharmacy.com
4918 Victoria Drive, Vancouver, BC, V5P 3T6
PST: HOURS: Weekdays: 8am-6pm, Saturday: 8am-4pm, Sunday: Closed
(PST: Pacific Standard Time)

74. This investigation has uncovered several other recent examples of these types of letters admonishing Cloud Pharmacy.

**X. Cooperating Defendant—Information Regarding Cloud Pharmacy**

75. On or about May 26, 2026, Mr. Becker, CEO of ScriptSourcing, became a cooperating defendant in this matter. Mr. Becker agreed to provide information to the investigative team and make phone calls at the direction of FDA-OCI.

76. On June 27, 2026, legal counsel for Mr. Becker provided a spreadsheet that was labeled as "WDVA – CCP – 6.27.2026." This spreadsheet contained a list of all shipments of medications into the Western District of Virginia ("WDVA"). These shipments were facilitated by ScriptSourcing and fulfilled by Cloud Pharmacy from March 24, 2021, to May 22, 2026. Cloud Pharmacy acted as the pharmacy and the company that imported the drugs into the United States. The total count of shipments of FDA regulated medications was 1571.

77. On June 3, 2026, legal counsel for Mr. Becker provided a snapshot of the financial transaction between ScriptSourcing and Cloud Pharmacy for January 2026 through May 23, 2026, that showed a substantial financial relationship between the two companies related to the illegal importation of drugs:

| Invoice Name | Invoice Period | Total Amount | Discount | Amount Due | Due Date |
|---|---|---|---|---|---|
| Invoice CCP 101-2026-B-10 Ref#253193 | 05/10/2026 - 05/23/2026 | $1,215,431.80 | $12,154.32 | $1,203,277.48 | 6/24/2026 |
| Invoice CCP 101-2026-B-10 Ref#253193 | 04/26/2026 - 05/09/2026 | $1,447,489.02 | $14,474.89 | $1,433,014.13 | 6/10/2026 |
| Invoice CCP 101-2026-B-09 Ref#253174 | 04/12/2026 - 04/25/2026 | $1,529,479.66 | $15,294.80 | $1,514,184.86 | 5/27/2026 |
| Invoice CCP 101-2026-B-08 Ref#253156 | 03/29/2026 - 04/11/2026 | $1,220,343.75 | $12,203.44 | $1,208,140.31 | 5/13/2026 |
| Invoice CCP 101-2026-B-07 Ref#253142 | 03/15/2026 - 03/28/2026 | $1,122,796.30 | $11,227.96 | $1,111,568.34 | 4/29/2026 |
| Invoice CCP 101-2026-B-06 Ref#253127 | 03/1/2026 - 03/14/2026 | $945,274.19 | $9,452.74 | $935,821.45 | 4/15/2026 |
| Invoice CCP 101-2026-B-05 Ref#253103 | 02/15/2026 - 02/28/2026 | $1,364,341.91 | $13,643.42 | $1,350,698.49 | 4/1/2026 |
| Invoice CCP 101-2026-B-04 Ref#253059 | 02/01/2026 - 02/14/2026 | $ 901,576.66 | $9,015.77 | $892,560.89 | 3/17/2026 |
| Invoice CCP 101-2026-B-03 Ref#253038 | 01/18/2026 - 01/31/2026 | $1,596,856.11 | $15,968.56 | $1,580,887.55 | 3/3/2026 |
| Invoice CCP 101-2026-B-02 Ref242977 | 01/04/2026 - 01/17/2026 | $1,806,858.27 | $18,068.58 | $1,788,789.69 | 2/18/2026 |
| Invoice CCP 101-2026-B-01 Ref242976 | 01/01/2026 - 01/03/2026 | $25,050.25 | $250.50 | $24,799.75 | 2/18/2026 |

78. It was communicated to this investigative team that these funds were sent via wire from ScriptSourcing to Cloud Pharmacy. On July 9, 2026, I viewed snapshots of transactions between the two companies for transactions occurring on May 29, 2026, and May 22, 2026.

## XI. Cooperating Defendant—Cloud Pharmacy Detained Shipments

79. On June 3, 2026, legal counsel for Mr. Becker provided a list of shipments that were in route or being prepared to be imported by Cloud Pharmacy into the Western District of Virginia. The information provided included the member name, tracking number, shipping stage, medication, and shipping address.

80. This information was conveyed to the U.S. Postal Inspection Service ("USPIS"), who subsequently seized and placed the parcels into evidence. Of the four parcels, three originated from Cloud Pharmacy.

a. Parcel labeled as Canada Post "LA 580 749 045 CA" was destined for Roanoke, VA 24018. The parcel contained three boxes of 90 Forxiga 10mg. Forxiga is an FDA regulated drug indicated for Type 2 Diabetes and Heart Failure. The labeling on the parcel showed that the parcel was from Cloud Pharmacy in Vancouver, British Columbia, Canada. The description of the contents on the label stated "1 BOX Personal health product". The label with Cloud Pharmacy on the boxes of Forxiga in the parcel had two doctors listed, one listed as the "USA PRESCRIBER" and the other that is assumed to be a Canadian prescriber, Dr. R. Aspinall.

b. Parcel labeled as Canada Post "ET 506 577 824 CA" was destined for Castlewood, VA 24224. The parcel contained seven Toujeo SoloSTAR injection pens. Toujeo SoloSTAR is an FDA regulated drug indicated to

improve glycemic control in adults and pediatric patients six years and older with diabetes mellitus. The labeling on the parcel showed that the parcel was from Cloud Pharmacy in Vancouver, British Columbia, Canada. The description of the contents on the label stated “BOX Personal health product”. The label with Cloud Pharmacy on the boxes of Toujeo SoloSTAR in the parcel had two doctors listed, one listed as the “USA PRESCRIBER” and the other that is assumed to be a Canadian prescriber, Dr. R. Aspinall.

c. Parcel labeled as “Canada Post "ET 506 372 919 CA" was destined for Wise, VA 24293. This parcel contained six boxes of 180 Entresto 26/24mg and one (1) box of Jardiance 25mg. Entresto is an FDA regulated drug indicated to reduce the risk of heart failure and for treatment of symptomatic heart failure with systemic left ventricular systolic dysfunction in pediatrics aged one year and older. Jardiance is an FDA regulated drug that is indicated to reduce the risk of heart failure and cardiovascular death. The labeling on the parcel showed that the parcel was from Cloud Pharmacy in Vancouver, British Columbia, Canada. The description of the contents on the label stated “BOX Personal health product”. The label with Cloud Pharmacy on the boxes of Entresto in the parcel had two doctors listed, one listed as the “USA PRESCRIBER” and the other that is assumed to be a Canadian prescriber, Dr. Walter Aguirre.

81. None of the parcels were labeled as prescription medication for personal use, prescription drugs, medications, the name of the medication, or any other nomenclature that would

have shown the parcels contained FDA regulated products such as prescription drugs. Instead, the boxes were labeled with an ambiguous statement that, in my training and experience, appears to be used to circumvent United States Customs.

82. These seizures corroborated the cooperating defendant's information and reflected the preexisting commercial agreement that existed between ScriptSourcing and Cloud Pharmacy to import, or smuggle, misbranded drugs into the United States.

**XII. Cooperating Defendant—Recorded Phone Calls**

83. On June 17, 2026, Mr. Becker made a recorded phone call at the direction of FDA-OCI to Keagan McLean ("Mr. McLean"). A summary of the pertinent information from this call is below:

a. Mr. Becker expressed to Mr. McLean that ScriptSourcing was going to be placing new orders with Cloud Pharmacy through new plan members with new medications. Mr. McLean said Cloud Pharmacy would keep an eye out and set up the new enrolments like they usually do. Mr. Becker brought up a text that Mr. McLean had sent him regarding an inconspicuous label. Mr. McLean said that he wanted to talk about it verbally rather than having it documented. Mr. McLean explained that the parcels they sent out had a Cloud Pharmacy label that included "affiliate names" on them and were placed underneath the Canada Post labels. The Cloud Pharmacy labels were faintly visible underneath the Canada Post labels. Mr. McLean explained that starting the prior Monday Cloud Pharmacy removed any reference to the affiliate's names on the label underneath. When asked why the underneath label was there, it was for internal organization so they could

prioritize ScriptSourcing packages over the others. Mr. Becker brought up packages getting stuck and asked where they were getting stuck. Mr. McLean said they were probably getting stuck in the L.A. (Los Angeles) port. Mr. McLean said that they were navigating around the L.A. port and have been seeing more success in the eastern ports. Mr. McLean further detailed that Cloud Pharmacy has engaged another company that is taking their shipments and then getting them to the East and then down and this has been going better than expected. Mr. McLean continued by stating they have not have any issues with customs with these test packages and they are going to continue to run that pilot program and might begin routing everything through the East Coast. They are doing this to try to do away with the problems by the L.A. port. The cold chain is a concern for Cloud Pharmacy but they are hoping to mitigate this risk by packaging the products in a larger cold package box. Mr. Becker asked about boxes destined to California. Mr. McLean said they will test shipping something through the East and then into California to see what type of delays will be experienced. Mr. McLean thanked Mr. Becker for the extra orders. Mr. Becker told Mr. McLean that Cloud Pharmacy was a great partner and appreciated him.

84. On June 5, 2026, the cooperating defendant made a recorded phone call with Pavan Dhillon. I have had the opportunity to review this call. The following is a summary, not a verbatim account, of this recorded phone call:

a. The cooperating defendant stated that they paused GLP1 shipments from Cloud Pharmacy. Part of this was due to being named in a defendant in the *Gilead Sciences v. Meritain Health, et al.* case. Mr. Dhillon said he was familiar with these types of actions and had been involved in them in the past. Mr. Dhillon said this was why they did not advertise anymore on their website because they know the ways "they" will come get you.

b. The cooperating defendant stated that the FDA was looking at folks in the international pharmacy space, particularly ones shipping GLP1. Mr. Dhillon said he kind of figured that and that generally they would do the same thing if they had those concerns. Mr. Dhillon said not to get drugs outside of Canada due to the temperature changes and the lack of quality control. Mr. Dhillon said that if someone called their store, Cloud Pharmacy, they would inform them they do not sell any of these things, they only do that with the cooperating defendant's company. Limiting advertisement and stuff on the internet limits exposure also. The worst thing that could happen, Mr. Dhillon explained, was if a patient become disgruntled because something happened and they go and complain. Mr. Dhillon said that was rare but those were the risks to be concerned about.

c. Mr. Dhillon said the reason Cloud Pharmacy takes advantage of the whole system is because the pharmaceutical industry and the FDA will never come to terms.

d. Mr. Dhillon said GLPs are the hot drugs currently and were the greatest hit of all time.

e. Mr. Dhillon discussed how the Canadian government protected the GLP drugs. Mr. Dhillon said don't push it too far but he thought the fight was mostly over.

f. The cooperating defendant said he was spooked because he was much more accessible by the authorities, the FDA, to get him rather than Mr. Dhillon. Mr. Dhillon said you have to think about different ways to set things up. Mr. Dhillon said if the employers came to them directly and did not go through ScriptSourcing, it would be a more traditional way and shift the liability to the employer. Mr. Dhillon said he would still know that it was ScriptSourcing and they would take care of that separately and deal with the employer directly. Mr. Dhillon said he looked at it as who has gotten in trouble and what were they doing that caused it.

g. Mr. Dhillon said in or about 2017 Canada Drugs got in trouble for counterfeit medications. Mr. Dhillon said if the cooperating defendant believed the FDA was not going to come get him, he was wrong. Some of his friends were working at the pharmacy and the FBI came into the pharmacy in Canada and conducted a search warrant and arrest warrant of Ken Fulkerson (ph). Mr. Dhillon said this was due to a counterfeit drug that someone got hurt on. Mr. Dhillon said that the government only gets involved when they go to cheaper alternatives other than Health Canada. Mr. Dhillon discussed someone else who got arrested for IPP when he traveled to the United States. This was due to the way the products were

getting shipped. Mr. Dhillon said they made decisions based on the arrest of others and stayed away from things like this.

h. Mr. Dhillon said he had a great lawyer that has been fighting this fight for 20 years. Mr. Dhillon said what Cloud Pharmacy does is a little bit different than others. Mr. Dhillon said he would provide his lawyer's advice at the charge of Cloud Pharmacy and that he was already on their payroll. Mr. Dhillon said they run their ideas by him prior to enacting them. Mr. Dhillon said their process was completely legal because they are not exporting. The end user is importing the drugs. The end user signs a power of attorney that allows them to import the drugs on their behalf. Mr. Dhillon said as long as you stick to the rules outlined for personal importation the FDA will not have a problem with you. Mr. Dhillon said if they were saying or advertising that they were exporting it would be a different story. Mr. Dhillon then said it still is a gray area that can be considered both ways, but if it was to be perfectly legal, this was the story that makes it that way and that is the story they follow.

i. Mr. Dhillon said the only weird thing for "us" was who the payer is in this situation. Mr. Dhillon said what ScriptSourcing does there is not even a name for, not a Pharmacy Benefit Manager or a Third Party Administrator or anything. Due to this, Mr. Dhillon said it was a "wild wild west" for the category of services ScriptSourcing was providing. Mr. Dhillon said because of this unknown, Mr. Dhillon was not able to know whether it was right or wrong or what it is. Mr. Dhillon then stated he believed in the

program because it puts patients first and they are standing on the right side of things and have some ground to stand on.

j. Mr. Dhillon said the problems can come when the pharmaceutical companies get involved. Mr. Dhillon said if they tell you to do something, you say yes sir, how high? This will keep you from getting highlighted.

k. Mr. Dhillon said he had some health issues and had begun delegating more to Mr. Mclean. Mr. Dhillon said Mr. Mclean was the most senior and responsible person in the organization. Mr. Dhillon said if he was not available Mr. Mclean was the person to talk to and have "these kind of conversations with." Mr. Dhillon said Mr. Mclean is at the executive level and was a substitute for Mr. Dhillon.

85. This conversation showed the details of the conspiracy to import drugs from Canada and Cloud Pharmacy's efforts to evade United States Customs.

**XIII. Gilead Sciences v Meritain Health, et al**

86. Gilead Sciences filed a complaint in December 2024 asking for a preliminary injunction to stop a network of companies they alleged were supplying patients with non-FDA approved, imported versions of Gilead's medicines via alternative funding programs. On September 30, 2025, Gilead filed an amended complaint that named, among others, ScriptSourcing and Gary Becker. This amendment was filed under case 1:24-cv-03566-JRR in the District of Maryland.

87. The amended complaint alleged: "By 2023, Meritain had known for years that CanaRx, ElectRx, and ScriptSourcing each ran international sourcing programs aimed at illegally importing foreign versions of prescription medicine to insured U.S. patients." Although this civil

case pertained to trademark infringement, the complaint outlines how the alleged criminal importation of drugs industry works.

88. These complaints also brought something else to light, harm to U.S. patients related to international pharmacy programs. The complaint stated:

a. "In February 2023, Meritain learned of what it referred to internally as the 'international sourcing horror story,' in which a U.S. patient received counterfeit medicine from ScriptSourcing's IPP, resulting in major physical harm to the patient."

89. These allegations go to the point of these are not risk free, money saving programs. They prioritize profits, disguised as savings, and put U.S. lives at risk.

**XIV. Probable Cause: Illicit Importation of Misbranded Drugs**

90. Based on my review of publicly available materials, statements made publicly by ScriptSourcing employees while performing business on behalf of ScriptSourcing, statements made by ScriptSourcing employees and Cloud Pharmacy employees on recorded phone calls, and email correspondence from ScriptSourcing employees and Cloud Pharmacy employees, there is probable cause to believe that ScriptSourcing and Cloud Pharmacy are illegally importing or causing the illegal importation of prescription drugs into the United States in violation Title 21 U.S.C. § 331 (t) and (aa), causing the introduction into interstate commerce of misbranded drugs in violation of 21 U.S.C. § 331(a), smuggling by knowingly and willfully importing merchandise contrary to law in violation of Title 18 U.S.C. § 545, and conspiring to do those acts in violation of Title 18 U.S.C. § 371. These drugs are misbranded in that they are new drugs that do not bear the FDA-approved labeling and they are not coming from U.S. licensed pharmacies.

91. Specifically, ScriptSourcing's business practices appear to involve:

a. Illegally importing or causing the illegal importation of prescription drugs from international sources, including Canada, United Kingdom, Australia, and New Zealand that are not authorized trading partners in the secure U.S. supply chain.

b. The use of foreign labeling and the shipment of drugs that are not approved by the FDA for distribution in the U.S.

c. Marketing of drugs to U.S. patients through employer health plans, without meeting the legal requirements for either personal-use or Section 804 Importation Programs (SIPs) pathways under 21 U.S.C. § 384.

92. Cloud Pharmacy's business practices appear to involve:

a. Illegally importing or causing the illegal importation of prescription drugs from Canada.

b. The use of foreign labeling and the shipment of drugs that are not approved by the FDA for distribution in the U.S.

c. Conspiring with ScriptSourcing to import drugs into the U.S., without meeting the legal requirements for either personal-use or SIP pathways under 21 U.S.C. § 384.

93. Statements and other communications made by employees of ScriptSourcing, including their promotion of international drug sourcing as a cost-saving measure, provide further evidence of the intent to bypass U.S. regulatory requirements for prescription drug importation while advertising that the drugs offered are FDA compliant.

94. ScriptSourcing's program involves them conspiring with international pharmacies, including Cloud Pharmacy, that are neither licensed in the United States or registered

with the Secretary in order to coordinate, sell, and distribute prescription drugs to U.S. patients outside the secure U.S. supply chain.

a. Cloud Pharmacy is not registered with FDA as a foreign seller under 21 U.S.C. 384 (f) and is also not a licensed pharmacy or a permitted nonresident pharmacy in the Commonwealth of Virginia as of November 5, 2025.

95. Based on these statements, along with promotional material describing the cost-saving nature of international drug sourcing, I have probable cause to believe that ScriptSourcing and Cloud Pharmacy are engaged in criminal activity related to the illegal importation of prescription drugs, which are also necessarily misbranded because they are distributed in a supply chain where each actor is not "regularly and lawfully engaged" in the wholesale distribution or dispensing of prescription drugs.

## XV. Probable Cause: Conspiracy

96. Based on the evidence described previously, there is probable cause to believe that ScriptSourcing and Cloud Pharmacy entered into an agreement or conspired to violate federal drug importation laws by:

a. Importing prescription drugs in the United States in violation of 21 U.S.C. § 331 (t) and (aa).

b. Introducing misbranded drugs into interstate commerce in violation of 21 U.S.C. § 331(a).

c. Interfering with FDA and CPB's legitimate regulatory authority by operating an illegal parallel supply chain for prescription drugs .

97. This agreement is evidenced by the coordinated business relationship between the target entities, wherein ScriptSourcing markets illegal drug importation services to U.S. employers and directs patients to the unlicensed Cloud Pharmacy, while Cloud Pharmacy ships prescription drugs directly to U.S. patients and coordinates with ScriptSourcing employees throughout the process.

98. Cloud Pharmacy's knowledge and intent: Cloud Pharmacy demonstrates knowledge of the illegal nature of their activities by shipping drugs intended for the Canadian market that were marked "Not for distribution outside of Canada" to addresses in the United States, including addresses in the Western District of Virginia. Canada Cloud's knowledge is also demonstrated by their intent to navigate around specific ports for their smuggling operations and avoid regulatory authorities.

99. The conspirators, ScriptSourcing and Cloud Pharmacy, committed numerous overt acts in furtherance of their agreement to illegally import prescription drugs, including but not limited to:

a. Coordinated communications: As previously described in this document, the conspirators utilized their email accounts and phone calls to coordinate between each other regarding patient orders and logistics.

b. Marketing and customer acquisition: ScriptSourcing marketed the illegal importation of prescription drugs and made statements that they operated throughout the country. ScriptSourcing directed patients to Cloud Pharmacy for prescription fulfillment. ScriptSourcing provides enrollment materials and coordination services.

c. Physical drug shipments: Cloud Pharmacy shipped prescription drugs from Canada to patients in the Western District of Virginia. To facilitate shipments, they utilized international mail services to transport drugs across international borders. Cloud Pharmacy provided mail service tracking information to Person 2, located in the WDVA, for prescription drug shipment. Cloud Pharmacy labeled prescription drugs shipped as "Personal health product" to avoid detection.

100. This investigation has shown that Cloud Pharmacy worked with ScriptSourcing in fulfilling the illegal drug importation into the WDVA since approximately March 24, 2021.

101. Based on the foregoing, there is probable cause to believe that ScriptSourcing and Cloud Pharmacy have conspired to violate federal law by conspiring to commit and committing the facilitation of the importation or smuggling of prescription goods that are misbranded or contrary to federal law.

102. This investigation has shown that the representative of ScriptSourcing that is responsible for ScriptSourcing's alleged criminal activity was, among other people, ScriptSourcing's CEO, Gary Becker.

103. This investigation has also shown that the representative of Cloud Pharmacy that is responsible for Cloud Pharmacy's alleged criminal activity was, among other people, Cloud Pharmacy employees Pavan Dhillon and Keagan McLean.

**CONCLUSION**

104. Your affiant believes that based on the above described facts and circumstances, and upon your affiant's training, knowledge, and experience, your affiant submits there is probable cause to believe that between March 24, 2021, and May 22, 2026, in the Western District of

Virginia and elsewhere, Cloud Pharmacy, Pavan Dhillon, Keagan McLean, ScriptSourcing, and Gary Becker conspired to commit and committed the offenses of importing prescription drugs into the United States in violation of 21 U.S.C. § 331 (t) and (aa); introducing misbranded drugs into interstate commerce in violation of 21 U.S.C. § 331(a); and smuggling by knowingly and willfully importing merchandise contrary to law in violation of Title 18 U.S.C. § 545. Conspiring to commit these crimes as shown in this affidavit was in violations Title 18 U.S.C. § 371, felony conspiracy.

**REQUEST FOR SEALING**

105. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is not public. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation because the subjects of the investigation would be aware of specific investigative activity by law enforcement agents.

Dustin Dobbs
Special Agent
Office of Criminal Investigations
U.S. Food and Drug Administration

Reviewed by: Danielle Stone, AUSA

Subscribed to and sworn before me telephonically
this 19th day of October, 2026.

HON. SCOTT H. JONES
UNITED STATES MAGISTRATE JUDGE